## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Branko and Nada Boricich, | ) | Bankruptcy No.  08 B 15248 |
| | ) | |
| Debtors, | ) | |
| | ) | |
| Phillip Dragisic, | ) | |
| individually and derivatively on behalf of White | ) | |
| Eagle, Inc. | ) | Adversary No.  08 A 00728 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Branko Boricich, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL

Phillip Dragisic filed this Complaint against Branko Boricich , a debtor in a related

voluntary Chapter 7 bankruptcy case. The Complaint, as ultimately amended, asserted five counts

against Boricich. Counts I- IV are asserted in Dragisic's individual capacity and seek judgments

on different grounds that a certain debt is nondischargeable under 11 U.S.C. § 523(a)(4). The

grounds are a claim of larceny (Count I), fraud while acting in a fiduciary capacity (Count II),

defalcation while acting in a fiduciary capacity (Count III), and embezzlement (Count IV). A fifth

count referred to here as Count V[1] is asserted by Dragisic derivatively on behalf of White Eagle,

Inc. and seeks a finding that the same debt is nondischargeable under § 523(a)(4), based on

allegations of fraud and defalcation in a fiduciary capacity, as well as larceny and embezzlement.

---

[1] The Complaint lists this shareholder derivative action "Count I," but since it is the fifth
count pleaded, and to avoid confusion it will be referred to as Count V.

After a trial and submission of final arguments in writing, the following facts are found and

conclusions of law are made and will be entered.

## JURISDICTION AND VENUE

Jurisdiction lies to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal

Operating Procedure 15(a). Counts I-IV are core proceedings under 28 U.S.C. § 157(b)(2)(I).

Count V, a shareholder derivative action, is also a core proceeding under 28 U.S.C.

§ 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409(a).

## FINDINGS OF FACT

Dragisic and Boricich met in early 1999. They were introduced by Joe Puhar, a mutual

friend. Puhar was aware that Dragisic was seeking to begin a career in the investment field and

knew that Boricich had experience as a trader on the Chicago Board of Trade ("CBOT").

Boricich had traded treasury bonds for more than ten years through his employer, Bank of

America, and later on behalf of himself. Dragisic then had no prior experience trading bonds or

commodities on the CBOT. The parties met on several occasions in early late 1999 and 2000 and

discussed going into business together.

In early 2000, Dragisic and Boricich orally agreed to organize an entity of which each

would be the owner of a one-half interest with equal and corresponding voting rights for the

purposes of investing and trading securities in the stock market and commodities on the CBOT.

Dragisic and Boricich agreed that, with respect to the operation and management of the entity, all

decisions must be agreed to by both of them.

Dragisic and Boricich further agreed that they, or an entity to be organized by them,

would purchase a full membership (the "Membership") on the CBOT as a joint investment on

2

behalf of the entity to be organized. Boricich had suggested that the Membership would be a good investment because the CBOT would likely go public, as the Chicago Mercantile Exchange had done, and because the CBOT owned valuable real estate. Dragisic and Boricich agreed to hold the Membership for five years unless both agreed to sell it.

Dragisic and Boricich caused to be organized a corporation, White Eagle, Inc. ("White Eagle"), under the laws of Illinois, but that corporation was involuntarily dissolved on August 1, 2005. Dragisic and Boricich were the only shareholders, directors, and officers of White Eagle. Boricich was the president and Dragisic was the secretary.

Dragisic and Boricich agreed it was necessary to raise funds from an outside investor in order to purchase the CBOT Membership. Dragisic contacted Philip Zepter ("Zepter"), a family friend and citizen of Monaco. Zepter provided White Eagle with $500,000 as his investment in the venture. On March 21, 2000, Dragisic received $500,000 from Zepter for this purpose. A trading agreement was drafted between Zepter and White Eagle, dated April 12, 2000, and was signed by Dragisic and Boricich, but the copy entered into evidence was not signed by Zepter.

Boricich represented to Dragisic that it would be better for any CBOT membership purchased by them for and on behalf of White Eagle to be purchased and held in the name of Boricich, as the nominee of White Eagle. Dragisic pleads that due to Boricich's superior experience and knowledge as a trader on the CBOT, he believed and relied upon Boricich. On April 11, 2000, Boricich purchased a Membership on the CBOT in his own name for the sum of $545,000. For that purchase, Boricich used $325,000 of the Zepter funds plus $220,000 of his own money which came from a personal loan Boricich had taken out from Burling Bank (the "Burling Bank Loan"). Burling Bank took a security interest in the Membership. O'Connor &

3

Company, a company for whom Boricich previously traded, was guarantor for the Burling Bank

Loan. Boricich used an additional $25,000 of the Zepter funds to trade in bonds on behalf of

White Eagle. Dragisic used the $175,000 remaining from Zepter's funds to pay White Eagle

expenses and to trade on behalf of White Eagle.

White Eagle, upon the purchase of the Membership in the name of Boricich as its agent

and nominee, traded in U.S. Treasury bonds for White Eagle. The trading account through which

this was accomplished was operated in the name of AKO, Inc., a corporation that had previously

been organized by Boricich. White Eagle maintained a separate account with Merrill Lynch.

Boricich testified that by July 2001, the market price of a CBOT membership had

dropped significantly and that combined with the negative balance of Boricich's personal trading

account at Cunningham Futures Clearing ("Cunningham"), this situation threatened security of

the guaranty of the Burling Bank Loan. Boricich testified that he was told by O'Connor &

Company that he needed to sell the Membership to pay off the loan. Boricich testified that he told

Dragisic the seat must be sold and that Dragisic did not object. Dragisic denies that conversation.

In August of 2001, Boricich sold the Membership for the sum of $325,000. The proceeds

were deposited into Boricich's cash account at Cunningham. The net sum received after costs of

that sale was $324,976.20.

Boricich thereafter used proceeds of that sale as follows:

a.     $167,947.39 paid to Burling Bank to pay off Boricich's personal loan incurred to
       finance purchase of the seat;

b.     $40,000 to repay a personal home equity loan that Boricich owed on his home;

c.     Two separate checks for $6,250, each paid to William Erdmier, an employee of a

4

company unrelated to White Eagle in which Boricich had an interest; and

    d.      One check for $1,600 paid to an employee of Boricich, unrelated to White Eagle.

After payment of certain other expenses, Boricich used the balance of the sale proceeds,

approximately $93,000, for trading in his personal account, all of which was ultimately lost in a

declining market.

After Boricich sold the Membership, he continued to trade treasury bonds through an

associate membership on the CBOT that he leased beginning on or about March 26, 2001. He

leased the seat until he stopped trading around January 2003. Boricich reported the results of his

trades to Dragisic throughout this period.

In April 2002, accountant Steven W. Anderson prepared White Eagle's tax return, a Form

1120S, together with Schedules K-1 on behalf of Dragisic and Boricich. Dragisic's Schedule K-1

reflected a net long-term capital loss of $132,750. Dragisic's accountant, Allen M. Abrams,

requested a copy of White Eagle's Form 1120S in order to understand the loss and Dragisic filed

for an extension of time to file Dragisic's individual tax returns. Abrams obtained a copy of the

Form 1120S in April 2003 which reported the Membership sale on August 1, 2001. Abrams then

informed Dragisic that it appeared the Membership had been sold. Dragisic testified that prior to

this time he had no reason to believe that the Membership had been sold and that Boricich never

consulted him or informed him of the sale. Abrams stated that Dragisic responded to him that the

Membership could not have been sold and that he would check with Boricich. Dragisic spoke to

Boricich who denied that the Membership had been sold and then claimed that the reported sale

on the tax return was a refinancing and was simply recorded as a sale on the tax return. Dragisic

told Abrams not to worry about it and to let White Eagle's accountant handle it. Dragisic stated

that he later became suspicious that Boricich had lied about not having sold the Membership and confronted him again. Boricich finally admitted he had sold the Membership in 2001. Dragisic inquired at the CBOT to confirm that the Membership had been sold in 2001.

Boricich filed a voluntary petition for Chapter 7 bankruptcy on June 13, 2008. On September 5, 2008, Dragisic initiated this Adversary proceeding, asserting the nondischargeability of a claim in the amount of $1,510,00, the highest value of a CBOT membership in May 2005, a date about five years after the Membership was purchased. Facts set forth in the conclusions of law will stand as additional findings of fact.

## CONCLUSIONS OF LAW

### I.    EXCEPTION TO DISCHARGE

The discharge provided under the Bankruptcy Code is meant to effectuate the "fresh start" goal of bankruptcy relief. *Grogan v. Garner*, 498 U.S. 279, 287 (1991). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995). The burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan*, 498 U.S. at 291; *see also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000) (quoting *Goldberg Sec.*, 979 F.2d at 524). "[Section 523(a)] is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chicago v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001).

## A. SECTION 523(a)(4), COUNTS I-V

Under 11 U.S.C. § 523(a)(4), a debt is nondischargeable if it is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" The meaning of these terms is a question of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003). In order to succeed under § 523(a)(4), a plaintiff must prove that the debtor committed (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; or (3) larceny. The Complaint alleges that Boricich in his individual capacity committed against Dragisic: the offenses of larceny (Count I), fraud while acting in a fiduciary capacity (Count II), defalcation while acting in a fiduciary capacity (Count III), embezzlement (Count IV), and asserts a shareholder derivative action in the fifth count against Boricich because of conduct complained of in the prior counts. For the purposes of this opinion, Dragisic's fraud and defalcation counts will be addressed together and the larceny and embezzlement counts will be addressed together. The shareholder derivative action will be addressed separately.

### 1.    Counts II and IIII: Fraud and Defalcation

In order to establish fraud or defalcation, the moving party must show: (1) the existence of an express trust or fiduciary relationship; (2) that the debt was caused by the debtor's fraud or defalcation; and (3) that the debtor acted as a fiduciary to the plaintiff at the time the debt was created. *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir. 1987).

The existence of an express trust or fiduciary relationship is tested under a federal law standard. *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000). To form an express trust or technical trust, there must be "an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust." *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 358 (Bankr. N.D.

7

Ill. 2004). Constructive, resulting, and implied trusts do not fall within the confines of

§ 523(a)(4). *In re Marchiando*, 13 F.3d 1111, 1115 (7th Cir. 1994). The lower court opinion in

that case expressed some additional considerations:

> The traditional definition of a "fiduciary" is not applicable in
> bankruptcy law. The general meaning–a relationship involving
> confidence, trust and good faith–is far too broad. The fiduciary
> relationship referred to in § 523(a)(4) has been held to be limited to
> express and technical trusts, neither of which the law implies from
> contract. Further, it must have existed prior to the creating the debt
> without reference to that act. Thus, implied or constructive trusts
> and trusts *ex maleficio* are not susceptible to the establishment of a
> fiduciary relationship under the Code.

*In re Marchiando*, 142 B.R. 246, 249 (N.D. Ill. 1992) (internal citations omitted). "Under Illinois

law, an express trust exists where there is (1) intent to create a trust; (2) definite subject matter or

trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose;

and (6) delivery of trust property to the trustee." *Id.* at 249-50 (citations omitted). "If any of the

necessary elements of a trust are not described with certainty, no trust is created." *Id.* at 250.

"'Express or technical trusts are formed by positive acts of both parties, typically manifested in

writing by a deed, will, or other such agreement.'" *Smith v. Marcet (In re Marcet)*, 352 B.R. 462,

470 (Bankr. N.D. Ill. 2006) (quoting *Schaffer v. Dempster (In re Dempster)*, 182 B.R. 790, 802

(Bankr. N.D. Ill. 1995)).

  However, a § 523(a)(4) cause of action can be based on a fiduciary relationship other than

one arising from an express trust. *Frain*, 230 F.3d at 1017. A Seventh Circuit panel opinion has

held for purposes of § 523(a)(4), that a fiduciary relationship exists where there is "a difference

in knowledge or power between fiduciary and principal which . . . gives the former a position of

ascendancy over the latter." *Marchiando*, 13 F.3d at 1116 (citation omitted). Examples of such

8

relationships include lawyer-client, director-shareholder, and managing partner-limited partner. *See Frain*, 230 F.3d at 1017.

There was no written declaration of trust in this case which created a fiduciary relationship between Dragisic and Boricich. Also, there is no evidence of the intent to create such a trust between Dragisic and Boricich. The evidence indicates that Zepter's money was to be an investment in White Eagle and that the funds were to be used for benefit of White Eagle, not for Dragisic individually. Because Dragisic was not the intended beneficiary of the Membership and retained no ownership interest in the Zepter funds or the Membership, Boricich owed no contractual fiduciary duty to Dragisic in his individual capacity with respect to the Membership. Boricich did owe White Eagle a fiduciary duty, an issue addressed below. Because Boricich owed no individual fiduciary duty to Dragisic, Dragisic cannot prevail on a claim of fraud or defalcation, which both require the existence of a writing creating a fiduciary relationship.

2.   Counts I and IV: Embezzlement and Larceny

Under § 523(a)(4), larceny requires a showing that the debtor wrongfully took property from its rightful owner with the fraudulent intent to convert such property for his own use without the owner's consent. *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991). Embezzlement differs from larceny in that the original taking was lawful, or at least with the consent of the owner; larceny requires that felonious intent exist at the time of the taking. *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 775 (Bankr. N.D. Ill. 2010) (citing *Rose*, 934 F.2d at 903).

Embezzlement under § 523(a)(4) has been defined as the "'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has

9

lawfully come.'" *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). A creditor must prove that (1) the debtor appropriated the creditor's property for the debtor's own benefit and (2) the debtor acted with fraudulent intent or deceit. *Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 334 B.R. 392, 400 (Bankr. N.D. Ill. 2005) (citing *Weber*, 892 F.2d at 538). It is not necessary to establish a trust or fiduciary relationship to prove embezzlement. *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380, 390 (Bankr. N.D. Ill. 1994).

In order for Dragisic to prevail on a claim of larceny or embezzlement, Dragisic must first demonstrate by a preponderance of the evidence that the Membership and the proceeds thereof were Dragisic's property. The evidence indicates that the Membership and its proceeds were property of White Eagle, not of Dragisic. Sale of the Membership was reported on White Eagle's 2001 tax return and Boricich admits that the Membership was held in trust for White Eagle. Though unsigned by Zepter, the trading agreement between the parties here is evidence that Zepter's $500,000 was intended by Dragisic and Boricich to be an investment in White Eagle, not property of Dragisic individually. It must be concluded that the Membership was purchased for the benefit of White Eagle, not for benefit of Dragisic individually. Since, the Membership was not property of Dragisic, he cannot succeed on his individual embezzlement and larceny claims.

3.   Fifth Count: Shareholder Derivative Action

Under Illinois law, dissolution of a corporation does not take away or impair any civil remedy available to the corporation, its directors, or shareholders for any claim or liability incurred prior to dissolution so long as any action is commenced within five years of the White

10

Eagle dissolution. 805 Ill. Comp. Stat. 5/12.80 (2008). This cause of action was commenced

within five years of dissolution, and therefore the cause of action rightly belonged to the

corporation when this action was filed. Dragisic must, therefore, assert standing derivatively on

behalf of all shareholders.

A shareholder has derivative standing where the injury is to the corporation and results in

the diminution of the value of his shares. *Hamilton v. Conley*, 827 N.E.2d 949, 955 (Ill. App. Ct.

2005). Self-dealing is a classic claim of injury to a corporation and must be brought derivatively.

*Id.* An officer or director who disposes of corporate assets for personal gain engages in self-

dealing. *Id.* A plaintiff must have been "a shareholder of record at the time the transaction of

which he or she complains[.]" 805 Ill. Comp. Stat. 5/7.80(a). A "shareholder" is "one who is a

holder of record of shares in a corporation." *Id.* § 1.80(g). There is no dispute that Dragisic was a

shareholder when the Membership was sold and when Boricich dispersed the proceeds of that

sale. Dragisic is a "shareholder of record" under the Illinois statute. Each of the parties here

owned 50% of the corporate stock.

In order to bring a derivative action, a shareholder must make a demand to obtain action

by the directors of the corporation and state either why the shareholder could not obtain such

action or why the demand was not made. *Id.* § 5/7.80(b). Failure to make such demand is excused

if the request would be futile. *In re Abbot Labs. Derivative S'holder Litig.*, 325 F.3d 795, 804

(7th Cir. 2003). To determine whether a demand is futile, a two-prong standard is applied.

Futility is established if "the plaintiff raises a reasonable doubt that (1) the directors are

disinterested and independent or (2) that the challenged transaction was the product of a valid

exercise of the directors' business judgment." *Silver v. Allard*, 16 F. Supp. 2d 966, 969 (N.D. Ill.

11

1998). Dragisic properly argues that a demand to the board of directors of White Eagle would

have been futile. Boricich was a fifty percent shareholder and one of only two directors. He

would not have approved any action against himself. A demand for corporate action would have

been useless, and Dragisic therefore has standing to bring this action derivatively.

Dragisic derivatively asserts on behalf of White Eagle that Boricich committed fraud and

defalcation in his fiduciary capacity as White Eagle's agent and trustee, embezzled property of

White Eagle, and committed larceny when Boricich appropriated the proceeds of the

Membership for his personal benefit.

a.    Larceny and Embezzlement

Larceny requires a showing that the debtor wrongfully took property from its rightful

owner with the fraudulent intent to convert such property to its own use without the owner's

consent. *Rose*, 934 F.2d at 903. To prevail on his derivative claim of larceny, Dragisic must

demonstrate that Boricich wrongfully took property from White Eagle and that Boricich had the

fraudulent intent to convert such property without White Eagle's consent. The initial taking of

property must be unlawful. That is not the case here. Boricich was lawfully in possession of the

Membership and lawfully in possession of the proceeds after the sale, though he held both in

trust for White Eagle. Dragisic's derivative action for larceny therefore fails.

Dragisic also claims Boricich embezzled the proceeds of the Membership. Embezzlement

requires a creditor to demonstrate that (1) the debtor appropriated the property in issue for his

own benefit; and (2) the debtor acted with fraudulent intent or deceit. *Cohen*, 334 B.R. at 400

(citing *Weber*, 892 F.2d at 538). To demonstrate fraudulent intent, one must show that there is an

intent to permanently deprive the owner of subject property. *Cohen*, 334 B.R. at 400 n.7. It is not

necessary to establish a trust or fiduciary relationship to prove embezzlement. *Pawlinski*, 170

B.R. at 390.

 As to the first element, Boricich used proceeds of the Membership sale to pay off a

personal loan used to finance the purchase of the Membership, to pay a portion of his home

equity loan which he had used to trade, and kept at least $93,000 for further trading purposes.

None of the proceeds of the sale Membership were transferred to White Eagle's Merrill Lynch

account and none of the proceeds of the sale of the Membership were used to repay Zepter.

Boricich admits that he sold the Membership for the specific purpose of repaying the Burling

Bank Loan because he was pressured by O'Connor & Company, the guarantor on the loan.

Though Boricich's debt to Burling Bank was incurred in order to purchase the Membership, that

debt was Boricich's personal debt, not the debt of White Eagle. Dragisic and Boricich did not

ever cause White Eagle to assume the obligations of the Burling Bank Loan. Additionally,

Boricich admits he used $40,000 to pay his home equity loan because he had used personal funds

from that loan to trade for White Eagle. Regardless of whether Boricich used personal funds to

trade for White Eagle, the home equity loan was Boricich's personal debt and there is no credible

evidence that payment of that debt was authorized by White Eagle or on its behalf.

 As Boricich admits, he held the Membership in his name on behalf of White Eagle. Its

sale was reported as a loss on White Eagle's 2001 tax return. It must be concluded that the

Membership was property of White Eagle and Dragisic has carried his burden of proving that

Boricich appropriated White Eagle's property–the proceeds of the sale of the Membership–for

his own benefit.

Dragisic must also establish that Boricich acted with fraudulent intent or deceit. Boricich testified that he informed Dragisic that the Membership must be sold and that Dragisic did not object, but that testimony was not credible as Boricich has shown by his conduct that he is not credible. There was no writing confirming the supposed agreement by Dragisic to the sale, and that sale took place much sooner than the agreed five year holding period required. Dragisic was unaware the Membership was sold until being informed by Abrams in 2003. Dragisic then spoke with Boricich who falsely told him it was listed as a sale on the tax return but really reported a refinancing and that they still owned the Membership. Dragisic then became suspicious that Boricich was lying. Boricich eventually admitted that the Membership was sold in 2001, and Dragisic confirmed that sale with the CBOT.

The testimony of Dragisic was credible, that of Boricich was not credible. Dragisic has demonstrated by preponderance of the evidence that he did not give permission for the Membership to be sold in 2001 and that he was unaware until 2003 that it had been sold. Dragisic's lack of knowledge coupled with Boricich's appropriation of the proceeds of the sale of the Membership for his own benefit demonstrate Boricich's deceit in handling the proceeds of the sale. Boricich used proceeds of the sale for his own benefit before Dragisic was even aware of the sale. In so doing, there can be no doubt that Boricich intended permanently to deprive White Eagle of its property, at least with respect to the funds he used to pay for expenses such as the Burling Bank Loan and his home equity loan. Dragisic has established both fraudulent intent and deceit of Boricich. Therefore, it is found and held that Boricich embezzled funds from White Eagle. The total amount of funds embezzled is addressed below.

14

b.   Fraud and Defalcation

In order to prevail on a claim for fraud or defalcation, Dragisic must demonstrate

(1) existence of an express trust or fiduciary relationship; (2) that the debt was caused by the

debtor's fraud or defalcation; and (3) that the debtor acted as a fiduciary to the plaintiff at the

time the debt was created. *Marchiando*, 13 F.3d at 1116.

Boricich admits that he held the Membership in trust for White Eagle as its agent and

nominee. Additionally, Boricich was a director and officer of White Eagle, and therefore he owed

a fiduciary duty to its shareholders. *See Follet Higher Educ. Group, Inc. v. Berman (In re*

*Berman)*, 629 F.3d 761, 766 (7th Cir. 2011). Boricich owned and controlled the Membership in

his own name and though there was an agreement with Dragisic to hold the Membership for five

years and not to sell it without consent of both parties, there was nothing to stop Boricich from

doing so. The concentration of power and control of the Membership in Boricich as compared to

Dragisic in his capacity as a shareholder was sufficient to create a fiduciary relationship. *See*

*Frain*, 230 F.3d at 1017-18 (chief operating officer's substantially one-sided concentration of

power gave rise to fiduciary duty owed to other shareholders). There is no dispute that Boricich

acted as such and used such power when he sold the Membership. Therefore, the first and third

requirements are met.

For purposes of § 523(a)(4), fraud is typically said to involve intentional deceit, rather

than implied or constructive fraud. *In re Fairgrieves*, 426 B.R. 748, 754 (Bankr. N.D. Ill. 2010).

Fraud is defined as "any deceit, artifice, trick, or design involving direct and active operation of

the mind, used to circumvent and cheat another[.]" *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th

Cir. 2000). As discussed with respect to embezzlement, it is concluded that Boricich acted with

15

fraudulent intent when he sold the Membership and used the proceeds to benefit himself instead

of White Eagle and deceived Dragisic when he failed to inform him of the sale, but continued

operations as if the sale had not happened. Although Boricich had agreed not to sell the

Membership without the consent of Dragisic, he intentionally circumvented Dragisic and

concealed the sale from him for almost two years before he finally admitted to the sale.

Therefore, Boricich committed fraud in his capacity as a fiduciary under § 523(a)(4).

"Defalcation" is not a defined term in the Code. Defalcation has been defined by one

court as "the misappropriation of trust funds held in any fiduciary capacity, and the failure to

properly account for such funds." *Strube Celery & Vegetable Co., Inc. v. Zois (In re Zois)*, 201

B.R. 501, 506 (Bankr. N.D. Ill. 1996) (internal quotation omitted). Courts apply an objective

standard, and intent or bad faith is not required. *Pawlinski*, 170 B.R. at 389. Seventh Circuit

authority requires something more than mere negligence, but less than fraud. *Meyer v. Rigdon*, 36

F.3d 1375, 1383 (7th Cir. 1994); *Kress v. Kusmierek (In re Kusmierek)*, 224 B.R. 651, 657

(Bankr. N.D. Ill. 1998).

Based on the above-discussion, Boricich misappropriated some proceeds of the

Membership sale which were property of White Eagle when he used some of these proceeds to

pay off personal debt instead of using or holding them for benefit of White Eagle. Furthermore,

Boricich failed to account for such funds. As such, Boricich committed defalcation in his

fiduciary capacity.

     c.    Amount of the Debt

Recently, the Supreme Court issued *Stern v. Marshall*, --- U.S. ---, 2011 WL 2472792

(June 23, 2011). In that case, the Court held that a bankruptcy court does not have jurisdiction

16

under the Constitution to enter final judgment on a state law counterclaim against a non-debtor

third party who had filed a proof of claim in the bankruptcy case. *Id.* at \*14. The opinion calls

into question whether a bankruptcy judge may enter a final money judgment of a state law claim

in a nondischargeability action. Prior to *Stern*, under Seven Circuit precedent, bankruptcy judges

have been allowed to determine the amount of a debt and enter a dollar judgment on that finding.

*See In re Hallahan*, 936 F.2d 1496, 1508 (7th Cir. 1991). In light of *Stern*, no dollar judgment

will be entered at this time, but the amount of the debt found nondischargeable will be

determined. However, jurisdiction is reserved to entertain a motion to amend this judgment

submitted within 28 days and supported by briefs discussing *Stern* and demonstrating that there

is Constitutional authority to enter such a money judgment.

Dragisic asserts a claim of $1,510,000 based upon the price of a CBOT membership in

May 2005, five years after the Membership was purchased. Dragisic asserts these damages based

upon Boricich's sale of the Membership prior to expiration of the five-year period during which

the parties agreed the seat would be held.

In opposing the Complaint, Boricich argues that the five year agreement is unenforceable

under the Statute of Frauds, 740 Ill. Comp. Stat. 80/1. That statute requires an agreement to be in

writing where the agreement is not to be performed within one year. Dragisic responds that this

argument has been waived by Boricich's failure to plead it earlier. Technical failure to raise the

Statute of Frauds in an answer may not be fatal where the opposing party has an opportunity to

respond to it. *See Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 929 (7th Cir. 1991) (finding

that failure to plead Statute of Frauds in answer to complaint was not fatal because opposing

party had a full opportunity to respond in its additional memorandum). Boricich raised the

Statute of Frauds for the first time in his post-trial Proposed Findings of Fact and Conclusions of

Law. Dragisic had and exercised his opportunity to respond fully in his Reply. Therefore,

Boricich did not waive the Statute of Frauds by failing to plead it in his answer.

Dragisic further argues that the Statute of Frauds is inapplicable due to the full

performance doctrine which states that the Statute of Frauds may not be used as a defense where

one party completely performs a contract. *Anderson v. Kohler*, 922 N.E.2d 8, 19 (Ill. App. 2d

2009). Dragisic agreed to form White Eagle with Boricich and raise capital, Zepter's $500,000,

and Boricich agreed to hold the Membership for the benefit of White Eagle and not to sell it for

five years unless both he and Dragisic agreed. Dragisic fulfilled his end of the bargain and the

full performance doctrine therefore precludes the defense of Statute of Frauds.

Boricich committed fraud when he sold the Membership in violation of the five-year

agreement not to sell. He intentionally circumvented Dragisic by not asking him for permission

to sell or even mentioning it to him prior to the sale. Boricich's intent to deceive is further

supported by the fact that Boricich went nearly two years before admitting the sale to Dragisic

after initially denying the Membership had been sold. Finally, Boricich's fraudulent violation of

the five-year agreement is evidenced by his personal use of the proceeds of the Membership sale,

cheating White Eagle out of the value of its primary asset.

The appropriate measure of the debt is the value of the Membership had Boricich not

fraudulently violated the agreement and sold the Membership earlier than agreed. The

Membership was purchased on April 11, 2000. The evidence presented reflected no sale of a

membership on April 11, 2005, but there were two sales of other memberships on April 12,

2005, one for $1,423,500.00 and one for $1,419,001.00. One cannot know whether White

18

Eagle's Membership would have sold for the higher or lower number, so the average of the two

numbers, $1,421,250.50, will be used. The net proceeds after costs of sale of the Membership on

August 1, 2001 was $324,976.20, and that must be subtracted, resulting in a net loss of

$1,096,274.30. Because it has been more than five years after dissolution of White Eagle, the

corporation no longer exists and any corporate assets that have not been disposed of belong to the

shareholders. *See In re Morris*, 30 F.3d 1578, 1582 n.2 (7th Cir. 1994); *Horbach v. Kaczmarek*,

915 F. Supp. 18, 21 (N.D. Ill. 1996). Dragisic and Boricich were each fifty percent shareholders.

Therefore, Boricich owes a debt of $548,137.15 to Dragisic, representing fifty percent of the debt

he owes to White Eagle.

This is not the end of the inquiry, however, because that figure represents the amount

which would be owed to Dragisic if all proceeds of the early Membership sale had been used for

the benefit of White Eagle. Much of the Membership sale proceeds were not used for the benefit

of White Eagle, but instead were used for Boricich's personal benefit. Boricich admitted that at

least $207,947.39 (repayment of the Burling Bank Loan plus the home equity payment of

$40,000), went toward loans he incurred in his individual capacity. Boricich also admitted that

two $6,250 checks were used to pay William Erdmier, an employee of White Eagle Trading

Company not of White Eagle, Inc. White Eagle Trading Company is a separate business entity

which Boricich controls. That entity has no connection with the White Eagle corporation formed

by both parties. Additionally, a $1,600 check was issued to an employee who either worked for

Boricich's company White Eagle Trading Company or for Boricich personally. The balance of

proceeds after paying certain other expenses was approximately $93,000, which Boricich used in

his trading account and which was ultimately lost.

19

Dragisic has demonstrated by a preponderance of the evidence that the Burling Bank Loan payment, the home equity loan payment, the two $6,250 checks, and the $1,600 check were used to benefit Boricich and his business entity, White Eagle Trading Company. However, Dragisic has failed to prove that the remaining $93,000 was used solely for Boricich's benefit. Boricich had been using the AKO account to trade on behalf of White Eagle since White Eagle's inception and the preponderance of evidence did not demonstrate that Boricich traded those funds solely for his own benefit. Therefore, Dragisic has proven that Boricich is liable to White Eagle for the payment of the Burling Bank Loan in the amount of $167,947.39, plus the payment of the home equity loan in the amount of $40,000, plus the checks referred to, in the total amount of $222,047.39. This, too, must be reduced by fifty percent, representing Dragisic's fifty percent interest in White Eagle, leaving $111,023.70 due from Boricich to Dragisic on the derivative claim. This amount must be added to $548,137.15 earlier calculated, resulting in a total nondischargeable debt of $659,160.85.

## CONCLUSION

For the foregoing reasons, judgment will separately be entered in favor of Dragisic on the shareholder derivative action for embezzlement, and fraud and defalcation in a fiduciary capacity. Judgment on all other counts is entered in favor of Boricich. A nondischargeable debt of $659,160.85 is thereby owed to Dragisic as fifty percent shareholder of White Eagle under 11 U.S.C. § 523(a)(4). Judgment on all other counts is entered in favor of Boricich.

This opinion constitutes the findings of fact and conclusions of law in accordance with

Federal Rule of Bankruptcy Procedure 7052. A separate Judgment order shall be entered

pursuant to Federal Rule of Bankruptcy Procedure 9021.

ENTER:


Jack B. Schmetterer
United States Bankruptcy Judge


Dated this  9th  day of June, 2011.